IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 12-304-(1) |
| | : | |
| JONATHAN GARCIA | : | |

**MEMORANDUM**

**JONES, II   J.**                                                                                                   **June 3, 2021**

**I.      INTRODUCTION**

Since the first cases of an unknown respiratory illness were reported in December 2019,[1] a localized outbreak of coronavirus disease 2019 ("COVID-19") quickly evolved into a global pandemic, causing a public health emergency of international concern.  As of this date, the World Health Organization has reported over 171.2 million confirmed cases of COVID-19 globally, including more than 3.6 million deaths.[2]  In the United States alone, total confirmed cases now exceed 33.3 million, and deaths surpass 595,000.[3]  In the context of this ongoing public health emergency, Jonathan Garcia has filed a motion for compassionate release from prison for "extraordinary and compelling reasons" under 18 U.S.C. § 3582(c)(1)(A).  For the reasons set forth below, Mr. Garcia's motion will be denied with leave to re-file.

---

[1] The World Health Organization ("WHO") traces the origin of COVID-19 to a local outbreak in Wuhan, China.  *See Listings of WHO's response to COVID-19*, WORLD HEALTH ORGANIZATION, https://www.who.int/news-room/detail/29-06-2020-covidtimeline (last updated Dec. 28, 2020) (reporting that the first cluster of COVID-19 cases emerged in December 2019).

[2] *WHO Coronavirus (COVID-19) Dashboard*, WORLD HEALTH ORGANIZATION, https://covid19.who.int/ (last updated June 3, 2021).

[3] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2021/us/covid-cases.html (last updated June 3, 2021).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Underlying Criminal Conduct

Mr. Garcia was a corrupt Philadelphia Police Officer who committed crimes in concert with his partner, Sydemy Joanis. In the order entered on January 7, 2015 in this matter—which denied Garcia's and Joanis's objections to the Presentence Investigation Report—the Honorable Legrome D. Davis described the nature of their illegal conduct:

> In 2010, Defendants began robbing the people they would encounter while on patrol. On April 15, 2010, Defendants stopped an individual for allegedly loitering in public. They recovered a quantity of crack cocaine and $350 in cash, but they split the money and falsely indicated to the Department that none was recovered. On June 3, 2010, Defendants stopped an individual who was fleeing from another officer, recovering a bag containing crack cocaine and $900. Again, the cash never made it into inventory; according to the property receipts, no money was recovered. On September 9, 2010, Defendants stopped an individual for riding a bicycle the wrong way on a one-way street. Searching him, Defendants recovered a bag of marijuana, several baggies of crack cocaine, and about $650. This time, Defendants successfully inventoried the marijuana and $105 in cash. Defendants kept the rest of the money, and the arrest report made no mention of the cocaine.
>
> Defendants' corrupt extracurricular activities included more elaborate schemes as well. Defendants developed a confidential source ("CS"), who they used to facilitate their robberies. On January 3, 2011, Joanis provided their CS with $40 cash and instructions to purchase two bags of crack cocaine from their mark, and Garcia told him where to arrange the transaction. At the agreed-upon location, Defendants pulled up in their police vehicle while the CS was conducting the purchase. As agreed, Joanis pretended to chase the CS as he fled the scene. Garcia searched the other individual and his car, recovering drugs and about $700 in cash. Defendants stole $392, which they split between them, and they inventoried the rest. They did not disclose the role of their CS in the encounter.
>
> In May 2012, the FBI received information that Garcia was selling heroin, usually in uniform and sometimes from his police vehicle, initially alerting them to the illegal activity of the Defendants. The FBI used the Defendants' CS to make several controlled purchases from Garcia in May and June 2012. The FBI used the same CS in a successful sting operation against Garcia and Joanis on June 19, 2012. Acting on direction from the FBI, the CS informed Garcia and Joanis that he knew someone visiting from out of state ("CS1") who was selling OxyContin pills. Garcia instructed the CS to buy three pills and leave

2

> two in plain view on the floor of CS1's car. FBI agents planted a bag containing a pill bottle with 97 placebo pills and $2,030 in the center console of CS1's car. The agents also gave CS1 $460, which he placed in his pocket. The CS bought three pills and dropped two on the floor of CS1's car, as directed. Garcia then conducted a traffic stop of CS1, and Joanis and a different partner arrived on the scene a few minutes later. Joanis's partner watched CS1 while Garcia and Joanis searched the car. Defendants recovered the cash and pills that the FBI had planted. At headquarters later, Garcia gave Joanis about $630 and kept $1,400 for himself. Defendants prepared reports falsely representing that they recovered $470 and 90 pills in the stop. FBI agents arrested Garcia, recovering $1,400 from his personal car.

Jan. 7, 2015 Order (ECF No. 77) at 2–3. Mr. Garcia pled guilty to one count of Hobbs Act robbery, one count of conspiracy to commit Hobbs Act robbery, and one count of attempted Hobbs Act robbery (all in violation of 18 U.S.C. § 1951(a)); two related counts of carrying a firearm during and in relation to those crimes of violence (in violation of 18 U.S.C. § 924(c)(1)); and four counts of distribution of heroin (in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C)). *See* Judgment (ECF No. 85) at 1–2. He was sentenced to a term of imprisonment of 210 months, imposed on all counts concurrently, and is serving his sentence at FCI Milan. His anticipated release date is August 28, 2027.

### B. COVID-19 in Correctional and Detention Facilities

"Correctional and detention facilities present unique challenges for control of COVID-19 transmission among incarcerated/detained persons and staff. According to public health experts, incarcerated individuals are at special risk of infection, given their living situations, and may also be less able to participate in proactive measures to keep themselves safe; infection control is challenging in these settings." *United States v. Wilson*, No. 14-cr-209, 2020 WL 1975082, at *2 (E.D. Pa. Apr. 24, 2020) (internal quotation marks, alterations, and footnotes omitted). Since the outbreak of the pandemic, the Bureau of Prisons ("BOP") "has implemented a number of

protocols to protect the inmate population and staff from COVID-19." *United States v. Stevens*, 454 F. Supp. 3d 472, 476 (E.D. Pa. 2020).

> Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan permits only limited group gathering and social distancing has largely been suspended. BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been suspended, as has most in-person staff training. BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved.
>
> Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with the Health Services Division and the CDC's guidance.

*United States v. Ortiz Cabrera*, No. 18-cr-304, 2021 WL 411502, at *2 (E.D. Pa. Feb. 5, 2021). At FCI Milan, where Mr. Garcia is incarcerated, there is currently one (1) confirmed, active case of COVID-19 among the inmate population. *See COVID-19 Cases*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited June 3, 2021).

### C. Mr. Garcia's Motion for Compassionate Release

Although he is only thirty-two (32) years old, Mr. Garcia asserts that he "is particularly vulnerable to the power of COVID-19" because he "suffers from chronic asthma and diagnosed hypertension." Mot. for Release (ECF No. 151) at 4. His motion provides no further details regarding his history with, or the severity of, either of these two purported conditions, and he has submitted no medical records to the Court in support of his motion. Mr. Garcia acknowledges that the "crimes for which [he] has pled guilty are serious and involve compromising his role as a police officer in Philadelphia by engaging in stealing drugs from dealers and subsequently

4

selling the drugs to others including a confidential informant," but notes that "there was never any violence or injury as a result of [his] scheme." *Id.* at 3–4. His motion also contends that the facts of his "crime of conviction were unique to his employment as a police officer[,] making any chance of recidivism impossible." *Id.* at 4.

### D. The Government's Response in Opposition

In its Response in Opposition to Mr. Garcia's Motion, the government asserts that Mr. Garcia's medical "records do not support [his] assertion that he suffers from asthma and hypertension," as "there is no documented history of either disorder, and [his] medical records do not show that he has been diagnosed with either asthma or hypertension." Gov't Opp'n (ECF No. 154) at 3. The government also points out that Mr. Garcia's presentence investigation report ("PSR") does not mention anything about Mr. Garcia having suffered from asthma, and states that, "'[a]ccording to the defendant, he is healthy and has no history of chronic illnesses.'" *Id.* at 4 (quoting PSR at ¶ 171).

The government contends that the "first mention of any breathing difficulties in the defendant's medical records occurs on August 26, 2020, two months after [he] submitted his request for compassionate release" to the warden. *Id.* at 3. It summarizes Mr. Garcia's medical visit on that date, as reflected in his medical records, as follows:

> At the August 26, 2020[] medical visit, the nurse practitioner administered a test to measure the defendant's peak flow rate of breathing. The test requires the patient to exhale forcefully into a measuring device.
> . . .
>
> The defendant's test registered low air flow; however, the nurse practitioner observed that the defendant's effort was only "fair," suggesting the possibility that the defendant deliberately exerted a "less than maximal effort" with the intention of producing a low airflow value. The nurse practitioner diagnosed the defendant not with asthma, but with "unspecified abnormalities of breathing," and prescribed an albuterol inhaler to be used "[a]s needed to relieve

5

> shortness of breath." The nurse practitioner placed no restrictions on the
> defendant's activities.

*Id.* at 4–5 (quoting Def.'s Med. Records (ECF No. 155) at 1, 4; Neuspiel, "Peak Expiratory Flow Rate Measurement," at https://emedicine.medscape.com/article/1413347-overview, updated Feb. 13, 2020) (internal citations and footnote omitted).

As to Mr. Garcia's claim that he suffers from hypertension, the government again argues that "the only documentation to support this claim comes from his medical visit on August 26, 2020," when his blood pressure was measured at 134/76. Gov't Opp'n at 5. It points out that his "medical records do not show that [he] was diagnosed with high blood pressure based on this single test," and that he "was not prescribed medication for high blood pressure or counseled on diet or lifestyle changes to reduce blood pressure." *Id.*

## III. LEGAL STANDARDS

"'A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)); *see also In re Morris*, 345 F. App'x 796, 797 (3d Cir. 2009) ("Once a term of imprisonment has been imposed, a district court has the authority to modify it only in limited circumstances."). One such exception is set forth in 18 U.S.C. § 3582(c)(1)(A), which provides for what is commonly referred to as "compassionate release." "As amended by the recently enacted First Step Act, § 3582(c)(1)(A) empowers a district court to modify a term of imprisonment on a defendant's motion after the defendant has exhausted his administrative remedies." *United States v. Moldover*, No. 14-637, 2020 WL 6731111, at *5 (E.D. Pa. Nov. 13, 2020).[4] Under § 3582(c)(1)(A)(i), a court may

---

[4] Here, the government acknowledges that Mr. Garcia submitted a request for compassionate

6

reduce an inmate's term of imprisonment only if the following conditions are met: (1) "the Court must find that extraordinary and compelling reasons warrant such a reduction"; (2) "any reduction granted by the Court must be consistent with any applicable policy statements issued by the Sentencing Commission"; and (3) "the proposed reduction must be consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a)." *United States v. Brown*, No. 13-176-05, 2020 WL 2615616, at *1 (E.D. Pa. May 22, 2020) (internal quotation marks omitted).

"Although Congress has not defined the term 'extraordinary and compelling,' the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term." *United States v. Ortiz Cabrera*, No. 18-304-01, 2021 WL 411502, at *3 (E.D. Pa. Feb. 5, 2021). As relevant here, Application Note 1 to Section 1B1.13 of the Sentencing Guidelines instructs that an "extraordinary and compelling" reason would be presented where a defendant is "suffering from a serious physical or mental condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." "In general, however, '[i]n the context of the current global pandemic, [c]ourts around the country have [only] granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19.'" *Moldover*, 2020 WL 6731111, at *7 (quoting *United States v. Sommerville*, 463 F. Supp. 3d 585, 596 (W.D. Pa. 2020)).

---

release to the warden of his facility several months before filing his motion with the Court, and, accordingly, does not contest that he has complied with this exhaustion requirement. *See* Gov't Opp'n at 3.

## IV. DISCUSSION

Mr. Garcia has not established that he suffers from any medical condition that places him in a position of unique vulnerability to the effects of COVID-19, and he has therefore not established an "extraordinary and compelling" reason for his release (to home confinement or otherwise). To be clear, the severity of the COVID-19 pandemic cannot be discounted, and the Court empathizes with Mr. Garcia's concerns. However, as the Third Circuit has held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). "Thus, the Court must conduct a highly individualized inquiry . . . to determine whether COVID-19 in conjunction with [Mr. Garcia's] alleged underlying medical conditions constitute extraordinary and compelling reasons for a reduction of [his] sentence to time served." *United States v. Cantatore*, No. 16-0189, 2020 WL 2611536, at *3 (D.N.J. May 21, 2020).

Mr. Garcia claims to suffer from asthma and hypertension. Mot. for Release at 4. The CDC has published on its website a "Table of Evidence" categorizing the "[e]vidence used to inform the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19." *Science Brief: Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/underlying-evidence-table.html (last updated May 13, 2021). The CDC's table indicates that the evidence is "mixed" as to whether asthma and hypertension can increase a person's risk of developing severe illness from COVID-19. *Id. See also United States*

*v. Porter*, No. 19-160, 2021 WL 1561500, at *3 (W.D. Pa. Apr. 21, 2021) ("the CDC [] specifically notes that there is mixed evidence as to whether hypertension is an underlying medical condition that can increase a person's risk of severe illness from COVID-19").

Accordingly, as there is currently no conclusive evidence establishing asthma and hypertension to be definitive risk factors, courts have consistently denied compassionate release to movants premising their requests on those conditions. *See, e.g.*, *United States v. Goode*, No. 10-177-02, 2020 WL 6445930, at *4–6 (E.D. Pa. Nov. 2, 2020) ("The danger COVID-19 presents to [the defendant], an individual with asthma, is not an 'extraordinary and compelling' reason sufficient to justify granting early release."); *Moldover*, 2020 WL 6731111, at *9 ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension.") (collecting cases); *United States v. Nesbitt*, No. 09-181, 2020 WL 3412577, at *3 (E.D. Pa. June 22, 2020) (finding the defendant's diagnosed hypertension insufficient to warrant compassionate release); *United States v. Tartaglione*, No. 15-491, 2020 WL 3969778, at *6 (E.D. Pa. July 14, 2020) (stating that hypertension is "not the kind of condition[] that place[s] [individuals] at a uniquely high risk of grave illness or death if infected by COVID-19").

Mr. Garcia has not presented any reason to depart from the overwhelming amount of case law denying compassionate release motions premised on claims of pre-existing asthma and/or hypertension, especially considering that his medical records do not indicate that he has actually been diagnosed with either condition. *See supra* § II.D; *see also United States v. Bautista*, No. 19-24-1, 2021 WL 1264596, at *4 (E.D. Pa. Apr. 6, 2021) ("A petitioner seeking compassionate release has the burden to prove extraordinary and compelling reasons exist.").

Though Mr. Garcia's fears of exposure to COVID-19 while incarcerated are understandable, the health of inmates is of the utmost concern to the BOP, and the BOP has made many strides to protect the safety of both inmates and staff during these unprecedented times. As discussed above, the BOP has been: issuing face masks to all staff and inmates, encouraging social distancing, strengthening cleaning, and limiting social gatherings in all facilities.[5] Further, inmates who are symptomatic and/or test positive for COVID are placed in medical isolation, and those who are asymptomatic but have a risk of exposure are placed in quarantine.[6] These measures appear to be having their intended effect; as discussed above, there is currently only one (1) confirmed, active case of COVID-19 among the inmate population at FCI Milan, the institution where Mr. Garcia is incarcerated.

In sum, Mr. Garcia has fallen far short of presenting "extraordinary and compelling reasons" warranting a reduction of his sentence or release to home confinement, and his Motion for Release must therefore be denied.[7]

## V. CONCLUSION

The Court concludes that Mr. Garcia has not demonstrated extraordinary and compelling reasons justifying his release to home confinement or a sentence reduction under 18 U.S.C. § 3582(c)(1)(A) and § 1B1.13 of the Sentencing Guidelines at this time. For the foregoing

---

[5] *See BOP Modified Operations*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/covid19_status.jsp (last updated Nov. 25, 2020).

[6] *See id*.

[7] "As [Mr. Garcia] does not present an extraordinary and compelling reason for his release, we deny his motion without assessing whether he presents a danger to the community or if Congress' sentencing factors warrant release." *United States v. Bautista*, No. 19-24-1, 2021 WL 1264596, at *6 (E.D. Pa. Apr. 6, 2021).

reasons, his Motion for Compassionate Release will be denied with leave to re-file, should any pertinent circumstances change.

An appropriate order follows.

BY THE COURT:

/s/ C. Darnell Jones, II
C. Darnell Jones, II    J.